UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CORISSA W.,

      *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

      *Defendant.*

_____/

Case No. 1:25-cv-12008

Patricia T. Morris
United States Magistrate Judge

**MEMORANDUM OPINION AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 12)**

## I.    CONCLUSION

Plaintiff Corissa W.'s motion for summary judgment will be **DENIED** (ECF No. 10), Defendant the Commissioner of Social Security's motion for summary judgment will be **GRANTED** (ECF No. 12), and the final decision of the Administrative Law Judge (ALJ) will be **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On April 20, 2022, Plaintiff applied for disability insurance benefits, alleging she became disabled on March 30, 2022. (ECF No. 6-1, PageID.38). The Commissioner initially denied Plaintiff's application in January 2023, and on

1

reconsideration in June 2023.  (*Id.* at PageID.38, 103–04).  Plaintiff then requested a hearing before an ALJ, which was held on April 22, 2024.  (*Id.* at PageID.60–86). The ALJ issued a written decision on June 21, 2024, finding Plaintiff was not disabled.  (*Id.* at PageID.35–59).  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on May 7, 2025.  (*Id.* at PageID.23–26).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on July 2, 2025.  (ECF No. 1).  The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters."  (ECF No. 8).  Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 10, 12) as well as Plaintiff's response to the Commissioner's motion (ECF No. 13).

## B.    Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified).  "[T]he threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id.* (citation modified).

### C.      Framework for Disability Determinations

Disability benefits are available only to those with a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 30, 2022, the alleged onset date.  (ECF No. 6-1, PageID.40).

At step two, the ALJ found the following severe impairments: degenerative disc disease of the cervical spine with obesity, thyroid disorder, and mental

5

impairments variously described as post-traumatic stress disorder (PTSD) with cannabis use disorder, psychophysiological insomnia, anxiety, depression, and bipolar disorder. (*Id.*). At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.42).

> Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except she has additional limitations. The claimant is limited to only occasionally climbing stairs, crouching, crawling, kneeling, and stooping/bending. She can occasionally balance as defined in the Selected Characteristics of Occupations (SCO). She is unable to work around hazards, so she is unable to climb ladders, ropes, or scaffolding or work at unprotected heights or around dangerous, moving machinery. The claimant is also limited to simple, routine work, which is work that requires only simple decisions and no complex decisions. She can have occasional interaction with supervisors, coworkers, and the general public. She is limited to work that is self-paced as opposed to working in a production-rate environment or in a job with an hourly quota.

(*Id.* at PageID.45).

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.51). However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.51–52). Specifically, the ALJ found Plaintiff could perform the requirements of a stock clerk (160,000 jobs in the national economy), an office clerk (145,000), and administrative support staff (40,000). (*Id.* at PageID.52). Thus, the ALJ concluded Plaintiff was not disabled. (*Id.* at PageID.53).

### E.       Administrative Record

On appeal, Plaintiff argues that the ALJ failed to evaluate the medical opinions of record in accordance with the relevant regulations.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issue on appeal.

On April 7, 2022, Plaintiff had a primary care appointment for a "[d]ramatic escalation of her anxiety symptoms" where she reported the following: " 'I am having a nervous breakdown.  I quit my job.  My counselor advised me to seek disability benefits.' " (ECF No. 6-1, PageID.470).  The provider adjusted Plaintiff's medications at this appointment (*id.*) and had a couple of check-in appointments with Plaintiff the following month (*id.* at PageID.442–64).

At a June 23 primary care appointment, Plaintiff presented as "tearful," with concerns including worsening anxiety.  (ECF No. 6-1, PageID.440).  The provider noted:

Going through a divorce.  Not eating.

About to become homeless.  Has no savings and no job

Cannot work in public – "severe social phobia" that she has had since childhood, which is why she elected to work from home 10 years ago

Cannot work in warehouse – cannot be on feet that long

Hoping for disability.  Working with counselor weekly.  Cannot afford more than once a week.  Fleeting thoughts of self-harm.  Feels like she wants to punch something to hurt herself but has not.  Denies suicidal

> ideation or homicidal ideation.  Has 1 friend she can confide in, and her counselor.  Otherwise limited support network.
>
> Feels trapped in her house, her lawyer told her not to leave into the divorce is final, otherwise she would lose position of her belongings.
>
> Trileptal 300mg – at night to help sleep
>
> lexapro 20
>
> Klonopin – tries to avoid [sic throughout]

(*Id.*).  Plaintiff returned the next month, reporting that she was still struggling with life stressors including her in-progress divorce, upcoming move, and her child not coming home. (*Id.* at PageID.434).  Plaintiff was attending counseling once or twice a week and taking Lexapro and Trileptal to manage her anxiety.  (*Id.*).  While Plaintiff presented as "[t]earful" and reported feeling "[v]ery sad," she denied any suicidal or homicidal ideation.  (*Id.*).  The provider increased Plaintiff's dose of Lexapro from 20 to 30 mg.  (*Id.* at PageID.434–35).

In late August 2022, Plaintiff was hospitalized for hypokalemia (low potassium).  (*Id.* at PageID.579–607, 649–749, 754–72).  Plaintiff reported the following:

> In March of 2022, she was told by her husband that he wanted a divorce and she's been having daily vomiting and diarrhea since then immediately after eating.  She states that she eats once a day and soon after will have an episode of vomit and diarrhea.  She denies noting any blood.  She also notes feeling heart palpitations and has pain over her sternum.  Since Mar/22 she has lost 60 lbs and doesn't have much of an appetite.  She notes that her anxiety is at a 8/10 due to their being many uncertainties in her life right now.  She denies any recent changes to

her medications.  Patient had lab work completed recently and the K level was found to be 2.2, she was the instructed to go to the ER.

Of note, the patient states that her divorce will most likely be finalized October 6 2022 and will not have health insurance after.  She just moved into a new apartment and is living with her [child].  Her Father and Step-Mother moved away and she lacks appropriate social support. She denies any [suicidal or homicidal ideation].  She is also currently applying for disability.  [sic throughout]

(*Id.* at PageID.604).  Plaintiff followed up with her primary care provider about a month after this hospitalization, reporting that she had taken three tablets of Klonopin in the preceding two weeks and had stopped taking Trileptal as she was "no longer getting into the depressed state" and felt her emotions were "not blunted." (*Id.* at PageID.812).  Plaintiff further reported that her depression was "[s]evere the week before [her] menses," but that this "[r]esolve[d] with menses."  (*Id.*).  The provider noted that Plaintiff had a history of premenstrual dysphoric disorder (PMDD).  (*Id.*).  No changes were made to Plaintiff's psychotropic medications at this visit.  (*Id.* at PageID.812–14).

From September 1, 2022 through February 14, 2024, Plaintiff attended therapy with Evan MacAdams, Psy.D, and records reflect her diagnosis as PTSD. (ECF No. 6-1, PageID.903–21; ECF No. 6-2, PageID.922–1004, 1502–1620).  At sessions on September 1, 7, and 9, 2022, Plaintiff presented in a depressed mood with a constricted or congruent affect, and was tearful as she discussed her recent hospitalization, divorce, and other stressors.  (ECF No. 6-1, PageID.903–04, 906–

9

07, 909–10).  Nonetheless, her attention was good and functional status intact at all three appointments.  (*Id.* at PageID.903, 906, 909).

At her September 14 session with Dr. MacAdams, Plaintiff presented in a dysphoric mood with congruent affect, reporting recently realizing that her mood was heavily impacted by her menstrual cycle, and overall "[d]emonstrated elevated mood." (*Id.* at PageID.912–13).  Plaintiff presented similarly at her next session two days later.  (*Id.* at PageID.915–16).  On September 21, Plaintiff again presented in a dysphoric mood with congruent affect, but "demonstrated lower mood and was tearful throughout" as she discussed her physical health problems, conflict with friends, and divorce.  (*Id.* at PageID.918–19).  Plaintiff's next session two days later went similarly.  (*Id.* at PageID.921; ECF No. 6-2, PageID.922).  On September 30, Plaintiff presented in a euthymic mood with congruent affect and Dr. MacAdams noted that she "demonstrated elevated mood and brighter affect despite continued stressors." (ECF No. 6-2, PageID.924–25).  Plaintiff's attention remained good with her functional status intact throughout September.  (ECF No. 6-1, PageID.912, 915, 918, 921; ECF No. 6-2, PageID.924).

Plaintiff presented to her October 5 session with Dr. MacAdams in an anxious mood with congruent affect, which was attributed to the upcoming mediation in her divorce proceedings.  (ECF No. 6-2, PageID.927–28).  A couple of days later, Plaintiff presented in a dysphoric mood with congruent affect, sharing her

dissatisfaction with how mediation went. (*Id.* at PageID.930–31). Plaintiff presented similarly at her next session on October 12, but also expressed positive emotions about a new romantic interest. (*Id.* at PageID.933–34). On October 14, Plaintiff was in an anxious mood with congruent affect and spent her therapy session discussing her experiences with romantic relationships and parenting concerns. (*Id.* at PageID.936–37). At her next session less than a week later, Plaintiff presented in the same mood, but reported "feeling [the] 'best' [she] has in [a] 'long time' and feeling increasingly hopeful." (*Id.* at PageID.939–40). Plaintiff presented in the same mood again on October 21, and expressed "feeling 'ready to live [her] life' and pursue 'happiness.' " (*Id.* at PageID.942–43). Five days later, Plaintiff was in a dysphoric mood with constricted affect, complaining about a bad weekend and recently injuring her back. (*Id.* at PageID.945–46). Two days after that, Plaintiff remained in a dysphoric mood with constricted affect, with Dr. MacAdams noting: "[Plaintiff] tearful throughout; continued to demonstrate dysphoric mood, more constricted affect, and more pessimistic attitude towards self, others, and world. [Plaintiff] denied risk/safety concerns." (*Id.* at PageID.948–49). Nonetheless, Dr. MacAdams indicated Plaintiff's attention was good and her functional status intact at each of her October sessions. (*Id.* at PageID.927, 930, 933, 936, 939, 942, 945, 948).

At her November 2, 2022 session with Dr. MacAdams, Plaintiff presented in

11

an anxious mood with appropriate affect, but overall was noted to be in a "demonstrated elevated mood over recent sessions despite having fire in home yesterday." (*Id.* at PageID.951–52). Plaintiff was in the same mood at her next sessions on November 4, 7, 11, and 16, where she continued to work through stressors including the fire and her divorce. (*Id.* at PageID.954–55, 957–58, 960–61, 963–64). On November 23, Plaintiff was in a dysphoric mood with congruent affect, which she indicated was "secondary to current life transition concerns." (*Id.* at PageID.966–67). Plaintiff's next session on November 30, went similarly, with her sharing feelings of increased stress due to the holidays. (*Id.* at PageID.969–70). About a week later, Plaintiff presented in a dysphoric mood with constricted affect, noting her "continued low mood exacerbated by [her] menstrual cycle" and other stressors. (*Id.* at PageID.972–73). On December 14, Plaintiff attended her session in a euthymic mood with appropriate affect, with Dr. MacAdams noting she "demonstrated and reported improved mood." (*Id.* at PageID.975–76). Dr. MacAdams noted this improvement had continued in notes from Plaintiff's December 19 session. (*Id.* at PageID.978–79). Dr. MacAdams continued to indicate that Plaintiff's attention was good and functional status intact throughout this period. (*Id.* at PageID.951, 954, 957, 960, 963, 966, 969, 972, 975, 978).

Plaintiff returned to her primary care provider on December 29, 2022, to follow up about her continued issues with nausea. (ECF No. 6-1 at PageID.872).

Plaintiff reported that her divorce had been finalized and that she was living in a trailer with her child. (*Id.*). She was unable to fall asleep due to "racing thoughts." (*Id.*). Taking Klonopin helped, but Plaintiff was "nervous to take it [due to] issues coming off it in the past." (*Id.*). She also reported continued nightmares and brain fog, saying that she was " 'just floating through life with no destination.' " (*Id.*). Plaintiff was tearful at the appointment and noted to be in a manic spell, which included hypersexual behaviors. (*Id.* at PageID.873). The provider adjusted Plaintiff's psychotropic medications, directed she be scheduled with a psychiatrist, and discussed community service with Plaintiff "to help get her out of the house, on a better schedule, and meeting people [who] will have a positive influence." (*Id.* at PageID.874).

Plaintiff had another primary care appointment the following month, where she reported that her "[s]leep and mood stability [had] improved" and that she was currently taking 50 mg of Lamictal to manage her mood. (*Id.* at PageID.838). However, Plaintiff continued to report "[t]errible PMDD," including crying the entire week before her menses. (*Id.* at PageID.839). Plaintiff disclosed that she had recently been sexually assaulted but said that she was working through it with her counselor and did not want to report the assault to law enforcement. (*Id.*). The provider told Plaintiff to increase her dose of Lamictal from 50 mg to 100 mg in two weeks. (*Id.* at PageID.840).

On January 4, 2023, Plaintiff had a therapy session with Dr. MacAdams, where she presented in a dysphoric mood with congruent affect.  (ECF No. 6-2, PageID.981).  Dr. MacAdams noted that Plaintiff "demonstrated [symptoms] of low mood (e.g. sleep disturbance, anhedonia)."  (*Id.* at PageID.982).  Plaintiff's next sessions on January 11, 18, and 25, went similarly, with Plaintiff tearful on January 25.  (*Id.* at PageID.984–85, 987–88, 990–91).  For each of her January appointments, Dr. MacAdams noted that Plaintiff's attention was good and functional status intact.  (*Id.* at PageID.981, 984, 987, 990).

On February 8, Plaintiff's mood had changed from dysphoric to anxious and she reported to Dr. MacAdams that she was "struggling with functionality and [activities of daily living (ADLs)] over past couple of weeks."  (*Id.* at PageID.993–94).  A week later, Plaintiff's mood had returned to dysphoric due to life stressors and past trauma, but Plaintiff reported "slightly improved functionality."  (*Id.* at PageID.996–997).  On February 22, Plaintiff presented in a euthymic mood with appropriate affect, reporting that

> yesterday was she and ex's wedding anniversary so decided to treat self to getting hair done and had "good day" and "wasn't even sad"; improved functionality over past week and fully unpacked and cleaned room, increased ability to complete ADLs and increased attention to self care; dating concerns and new crush; [b]irthday is tomorrow and planning to spend day with childhood best friend.

(*Id.* at PageID.999–1000).  About a week later, Plaintiff's mood had worsened to dysphoric due to "feeling 'hurt,' 'angry,' and 'disappointed' and like 'heart was

14

broken' secondary to childhood best friend canceling plans for [Plaintiff's] birthday at last minute and lying about reason for doing so." (*Id.* at PageID.1002–03). On March 9, Plaintiff complained of a "'complicated' and 'hard' week secondary to interpersonal concerns and dating concerns which are causing [her] to feel more 'anxious' lately." (*Id.* at PageID.1502). Dr. MacAdams continued to indicate that Plaintiff's attention was good and functional status intact. (*Id.* at PageID.990, 993, 996, 999, 1002).

Plaintiff treated with New Oakland Family Centers from March 9, 2023 through February 1, 2024. (*Id.* at PageID.1018–64, 1426–95). At her March 9 initial evaluation, it was noted that

> [Plaintiff] is coming for services due to continued Bipolar symptoms and anxiety. [Plaintiff] reports that this has been happening for the past year. Consumer reports that some precipitating events include: getting a divorce from her ex-husband in 11/2022. [Plaintiff] reports that she experiences the following symptoms: hopelessness, worthlessness, crying spells, low frustration tolerance, irritability, mood swings, decreased appetite, decreased sleep, diminished ability to concentrate, easily distracted, racing thoughts, excessive worry, panic attacks on a daily basis, isolation, poor ADL's, low motivation and decreased energy. [Plaintiff] reports that she experiences these symptoms on a daily basis and range in intensity. [Plaintiff] denies [suicidal ideation]/[homicidal ideation]/psychosis but reports marijuana use on a daily basis.

(*Id.* at PageID.1057). Plaintiff presented as cooperative, in a depressed and anxious mood with impaired concentration, and showing no other notable symptoms. (*Id.* at PageID.1061–62).

On March 15 and 22, Plaintiff had therapy sessions with Dr. MacAdams, where she presented in a dysphoric mood with congruent affect, reporting difficulties managing her mood around her menstrual cycle and life stressors including dating and conflict with friends. (*Id.* at PageID.1504, 1507–08). At her March 29 session, Plaintiff was in an anxious mood and discussed her "elevated mood over past week characterized by improved sleep and increased energy" and current life stressors. (*Id.* at PageID.1510–11). For each session, Dr. MacAdams noted that Plaintiff's attention was good and her functional status intact. (*Id.* at 1504, 1507, 1510).

The next month, Plaintiff attended a teletherapy appointment with New Oakland in a depressed mood with congruent affect and was "tearful as she discussed contributing factors to her current mental health challenges . . . . Symptoms: fluctuating sleep pattern, cry[ing] spells, social anxiety, confusion, difficulty with focus, concentration, distractibility, and attention, ruminative, negative thought pattern." (*Id.* at PageID.1038–39). Plaintiff was described as "pleasant, cooperative, and engaged during session" but "tearful as she shared some of the challenges with adjusting to her 'new life' after getting divorced." (*Id.* at PageID.1040). Plaintiff presented similarly at her next appointment a couple of weeks later, with some additional findings, including an anxious and depressed mood as opposed to just depressed, verbose speech, and "ruminative, anxious, negative thought pattern; content [within normal limits]." (*Id.* at PageID.1035–36).

16

Similarly at her April 19 session with Dr. MacAdams, Plaintiff "demonstrated depressed mood and was tearful throughout." (*Id.* at PageID.1513–14). Dr. MacAdams noted that Plaintiff "demonstrated slightly elevated mood though was tearful several times throughout" at her next session on April 26. (*Id.* at PageID.1516–17). Plaintiff was also "tearful several times throughout" her May 3 session. (*Id.* at PageID.1519–20). Plaintiff's next session on May 10 went similarly. (*Id.* at PageID.1522–23). Dr. MacAdams rated Plaintiff's attention as good and functional status as intact for each appointment. (*Id.* at PageID.1513, 1516, 1519, 1522).

On May 9, 2023, Plaintiff underwent a psychiatric evaluation so New Oakland could start prescribing her psychotropic medications. (*Id.* at PageID.1029). Plaintiff said "that she has been having these symptoms for four years" but that they worsened a year ago. (*Id.*). At that time, she was taking "Lamictal 100mg daily, Klonopin 0.5mg BID PRN and Lexapro 20mg daily." (*Id.*). Plaintiff presented as cooperative; in a depressed mood with labile affect, goal-directed thought process, impaired concentration, impulse control, and judgment, soft speech, decreased appetite and sleep; and thought content and psychomotor activity that were within normal limits. (*Id.* at PageID.1031–32). Her primary diagnosis was Bipolar I disorder, secondary was generalized anxiety disorder, and tertiary was panic disorder. (*Id.* at PageID.1033). She was instructed to continue taking Lamictal, Klonopin, and

17

Lexapro at their current dosages and add on Vraylar 1.5 mg to better manage her Bipolar symptoms.  (*Id.*).

A couple of weeks later, Plaintiff presented to a therapy session with New Oakland appearing

> anxious and depressed [with a] flat affect, leg bouncing, hand and voice shaky, verbose, tearful, negative self-talk.  [Plaintiff] reports increased drinking (3–4 days/week, more than 4 drinks) and increased spending.  She reports that she went on drinking binge from 05/11–05/13; she reports that she went home in intervals.  [Plaintiff] reports that while on the "binge," she "hopes I (she) have had my eye opener" as she reports that a male she was hanging out with "took advantage of her" (i.e., sexually assaulted); she reports it is not the first time he has assaulted her.  [Plaintiff] did not and does not want to report assault, requested writer not report assault as well.  [Plaintiff] reports she was "really drunk"; therefore, she does not remember what happened but states she "woke up with my [her] underwear around my [her] ankles"; [she] also has bruise (approx. quarter size) on her right forearm and small bruises on both legs.  She also reported that male informed her of what happened.  [Plaintiff] currently denies [any suicidal ideation/self-injurious behavior/hallucinations].

> She reports she has not started Vraylar due to an upcoming road trip (next week) and expressed being "nervous about driving alone and having side effects," wants to start medication once she returns from road trip.

(*Id.* at PageID.1027).   Nonetheless, Plaintiff was "pleasant, cooperative, and engaged during session."  (*Id.* at PageID.1028).  At her medication review a few weeks later, Plaintiff reported that things were "[g]oing okay" overall, her average anxiety was 6/10 and depression 4/10, her appetite was poor due to ongoing gastrointestinal problems for which she was undergoing testing, her sleep was good,

and she was not experiencing any suicidal or homicidal ideation, self-injurious behavior, or hallucinations. (*Id.* at PageID.1020). Plaintiff was noted to be cooperative and in an anxious mood with impaired attention/concentration, but displaying no other notable symptoms. (*Id.* at PageID.1021–22). Plaintiff was instructed to continue taking Lamictal, Klonopin, and Lexapro as prescribed while her Vraylar dose was increased. (*Id.* at PageID.1024).

Similarly, at her May 17 session with Dr. MacAdams, Plaintiff disclosed the recent sexual assault; at her next session on May 24, she told Dr. MacAdams that she had reported to the assault to law enforcement. (*Id.* at PageID.1525–26, 1528–29). A week later, Plaintiff was in a euthymic mood, explaining: " 'I'm actually good for once' secondary to having a 'great and wonderful time' in Ohio and feeling like she 'found my soul twin' in friend who she's now interested in romantically as has never felt so seen or understood." (*Id.* at PageID.1531–32). In notes for all three appointments, Dr. MacAdams continued to rate Plaintiff's attention as good but, for the first time, rated her functional status as "Mildly Impaired." (*Id.* at PageID.1525, 1528, 1531).

On June 7, Plaintiff presented to her session with Dr. MacAdams in an anxious mood due to a tense video call with her love interest. (*Id.* at PageID.1534–35). By June 21, Plaintiff was in a dysphoric mood, mentioning she had woken up that day feeling sad but did not know why. (*Id.* at PageID.1537–38). Plaintiff seemed to be

19

doing better at her June 28 session, despite being in an anxious mood. (*Id.* at PageID.1540–41). Dr. MacAdams rated Plaintiff's attention as distractable and her functional status as mildly impaired for each June appointment. (*Id.* at PageID.1534, 1537, 1540).

On July 12, Plaintiff presented to her session with Dr. MacAdams in dysphoric mood and primarily talked about recent family conflict. (*Id.* at PageID.1543–44). At her sessions on July 19, July 26, August 9, and August 16, Plaintiff was tearful as she discussed her life stressors and past trauma. (*Id.* at PageID.1546–47, 1549–50, 1552–53, 1555–56). Specifically, at her August 16 session, Plaintiff reported hitting herself during an argument with her current romantic interest, and Dr. MacAdams "[s]uggested [Plaintiff's] increased engagement in unhealthy [behaviors] that [are] harmful to her signifies that this relationship is not healthy for her." (*Id.* at PageID.1556). While Plaintiff's mood remained dysphoric at her August 23 session, Dr. MacAdams noted that she "demonstrated elevated mood over last week." (*Id.* at PageID.1558–59). The primary focus of Plaintiff's September 6 session was her distress over running out of all her psychotropic medications due to difficulties obtaining refills from New Oakland. (*Id.* at PageID.1561–62). On September 12, Plaintiff discussed her "continued romantic relationship concerns" and plan to get back on her medications. (*Id.* at PageID.1564–65). Until September 12, Dr. MacAdams continued to note that Plaintiff's attention was either distractible

or variable and functional status mildly impaired, with him indicating on that date that Plaintiff's functional status had worsened to moderately impaired. (*Id.* at PageID.1543, 1546, 1549, 1552, 1555, 1558, 1561, 1564).

The absence of records suggests that Plaintiff did not attend any appointments at New Oakland in July or August 2023. She returned on September 11, 2023, for a medication review visit. (*Id.* at PageID.1489). Plaintiff reported that she was not doing well because she had been unable to timely refill her psychotropic medications. (*Id.*). While Plaintiff's primary care provider was able to write her a new prescription for Lexapro, the provider would not prescribe her other medications. (*Id.*). Plaintiff was reminded to call New Oakland's dedicated medication refill line when she needed refills. (*Id.*).

Plaintiff's anxiety was 8/10, which was partially related to issues her child was going through, and her depression was 8/10. (*Id.*). Plaintiff's appetite continued to be poor due to her gastrointestinal issues but her sleep was "[p]retty good." (*Id.*). Plaintiff denied suicidal and homicidal ideation, self-injurious behavior, and hallucinations. (*Id.*). She was cooperative, in a depressed and anxious mood with labile affect, goal-directed thought process, and impaired concentration. (*Id.* at PageID.1490–92). Plaintiff was instructed to continue taking Lexapro, Lamictal, Klonopin, and Vraylar as prescribed and in accordance with a couple of dosing changes. (*Id.* at PageID.1494). About a week later, Plaintiff had an appointment

with her primary care provider, where she presented with a "calm affect," reported she was doing well with regular therapy, and expressed she was "feeling much better" on her current combination of Lexapro, Klonopin, Lamictal, and Vraylar. (*Id.* at PageID.1246–47).

At her September 19 session with Dr. MacAdams, Plaintiff was in a depressed mood, with Dr. MacAdams writing, "[c]ontinued to assess [symptoms] of mood instability and emotional dysregulation secondary to [Plaintiff] being off of meds for a few weeks and recently restarting." (*Id.* at PageID.1567–68).  On September 27, Plaintiff's mood had changed to anxious and Dr. MacAdams noted she had "improved mood and emotion dysregulation over past week secondary to psychiatric medications kicking in."  (*Id.* at PageID.1570–71).  At her October 4 session, Plaintiff was still anxious and Dr. MacAdams "[c]ontinued to assess [symptoms] of restlessness and psychomotor agitation and again encouraged [Plaintiff] to contact psychiatric provider about this." (*Id.* at PageID.1573–74).  For each appointment, Dr. MacAdams indicated Plaintiff's attention was variable and functional status ranged between mildly and moderately impaired.  (*Id.* at PageID.1567, 1570, 1573).

On October 10, 2023, Plaintiff returned to New Oakland for a medication review appointment.  (*Id.* at PageID.1482).  Plaintiff reported potential side effects of jitteriness and " 'extra energy' " from her medications, but indicated her anxiety and depression levels had both improved to 5/10.  (*Id.*).  She had good appetite and

sleep and no suicidal or homicidal ideation, self-injurious behavior, or hallucinations. (*Id.*).  Plaintiff was cooperative and in a euthymic mood with goal-directed thought process, impaired attention/concentration, and no other notable symptoms.  (*Id.* at PageID.1483–85).  Plaintiff's dose of Klonopin was decreased, her doses of her other three medications remained the same, and she was newly prescribed Hydroxyzine 10 mg for anxiety and akathisia.[1]  (*Id.* at PageID.1487). Plaintiff attended a therapy session later that month, presenting "as pleasant and engaging" with no findings outside of normal limits.  (*Id.* at PageID.1469–71).

On October 26, Plaintiff presented to her session with Dr. MacAdams in a dysphoric mood, sharing her difficulties with her physical health after a recent injury and other life stressors.  (*Id.* at PageID.1576–77).  At her November 1 session, Plaintiff was depressed, expressing feeling " 'really down,' " lonely, and " 'really worried' " about her significant other due to him experiencing suicidal ideation.  (*Id.* at PageID.1579–80).  Plaintiff's mood was dysphoric on November 7, and the session focused on the same topics as her previous two sessions.  (*Id.* at PageID.1582–83).  Dr. MacAdams rated Plaintiff's attention as variable and functional status as mildly impaired for each of these appointments.  (*Id.* at

---

[1] "Akathisia is an inability to remain physically still.  It's a movement disorder that's linked to certain types of medications, especially antipsychotic medications.  People with akathisia feel an intense and uncontrollable need to move — mainly, their lower body." https://my.clevelandclinic.org/health/diseases/23954-akathisia (last updated Aug. 5, 2022).

PageID.1576, 1579, 1582).

At her November 9 medication review visit at New Oakland, Plaintiff reported her anxiety had improved to 4/10 and depression worsened to 7/10, she had been "feeling really, really dull," her appetite was good, and she was probably sleeping a "[a] little too much." (*Id.* at PageID.1462). Findings were normal other than a depressed mood with labile affect and impaired attention/concentration. (*Id.* at PageID.1464–65). Plaintiff was instructed to continue taking her current doses of all medications except Lamictal which was increased from 50 mg to 100 mg. (*Id.* at PageID.1467). At her next therapy appointment about a week later, Plaintiff's symptoms were all within normal limits. (*Id.* at PageID.1459–60). A few weeks later, Plaintiff told her therapist that "she felt her psychotropic medication [regimen] is ineffective because her mood and energy level has been consistently low." (*Id.* at PageID.1457). All of Plaintiff's symptoms were again found to be within normal limits. (*Id.* at PageID.1456–57).

Meanwhile at her November 15 session with Dr. MacAdams, Plaintiff was in an anxious mood, with Dr. MacAdams noting that they spent the session processing her "trauma response to being one year out from divorce and worked on restructuring associated distorted beliefs." (*Id.* at PageID.1585–86). Plaintiff was in an anxious mood again on November 22, secondary to her ongoing physical health concerns. (*Id.* at PageID.1588–89). A week later, Plaintiff presented in a depressed mood due

24

to continued physical health problems and her significant other's low mood at Thanksgiving with her parents. (*Id.* at PageID.1591–92). Plaintiff's mood was dysphoric on December 6 and 20, with her talking about difficulties in her relationships with both her significant other and child. (*Id.* at PageID.1594–95, 1597–98). For each of these appointments, Dr. MacAdams noted Plaintiff's attention was variable and functional status mildly impaired. (*Id.* at PageID.1585, 1588, 1591, 1594, 1597).

On December 11, 2023, Plaintiff had an appointment with her primary care provider to address sinus issues. (*Id.* at PageID.1198). It was noted that Plaintiff had been "struggling with chronic weight loss secondary to uncontrolled anxiety/depression, uncontrolled nausea," but that at that appointment it appeared her "[o]verall symptoms are improving, up 11 pounds. Eating well. Has a boyfriend. Makes her happy." (*Id.*). Plaintiff reported side effects from her psychotropic medications of all-day sleepiness and "[f]eeling dull." (*Id.* at PageID.1199). When Plaintiff returned to primary care the next month to address hypertension and weight gain, she "appear[ed] well, in no apparent distress. Alert and oriented times three, pleasant and cooperative." (*Id.* at PageID.1175–76).

At her December 20 medication review at New Oakland, Plaintiff reported her anxiety had increased to 9/10, which she attributed to holiday stress, and depression to 8/10, continued feelings of dullness and extra energy, poor appetite,

and excess sleep.  (*Id.* at PageID.1449).  Her notable symptoms were depressed mood with labile affect and impaired attention/concentration.  (*Id.* at PageID.1451–52).  Plaintiff was instructed to continue taking Hydroxyzine, Lamictal, and Klonopin as previously prescribed and to start taking Fluoxetine and weaning off Lexapro.  (*Id.* at PageID.1454).

The following month, Plaintiff was told to stop taking Fluoxetine after she reported being unhappy with the change and "feeling worse."  (*Id.* at PageID.1442, 1447–48).  Plaintiff's symptoms were depressed mood, increased appetite, and impaired attention/concentration.  (*Id.* at PageID.1442, 1444–45).  Later that month, Plaintiff's medication regimen was changed to Wellbutrin, Cogentin, Lamictal, and Klonopin due to an onset of high blood pressure.  (*Id.* at PageID.1434).  Plaintiff's notable symptoms were depressed mood and impaired attention/concentration.  (*Id.* at PageID.1431–32).  She reported her anxiety had improved to 4/10, depression worsened to 9/10, appetite had increased, and sleep was difficult due to "having multiple nightmares and flashbacks."  (*Id.* at PageID.1429).  The next day, Plaintiff attended a therapy session where she discussed these medication changes.  (*Id.* at PageID.1427).  All her symptoms were found to be within normal limits.  (*Id.* at PageID.1426–27).

On January 3, 2024, Plaintiff had her first session of the new year with Dr. MacAdams, presenting in a depressed mood with constricted affect and sharing

difficulties with her current life stressors. (*Id.* at PageID.1600–01). A week later, Plaintiff's mood and affect remained the same, with her continuing to express symptoms of low mood. (*Id.* at PageID.1603–04). At her January 24 session, Plaintiff was in a dysphoric mood with constricted affect, expressing concerns about her elevated blood pressure and sharing her symptoms of low mood. (*Id.* at PageID.1607–08). On February 7, Plaintiff presented in the same mood and affect as her prior session and Dr. MacAdams noted that he "[a]ssessed continued mood disturbance, increased PTSD [symptoms], and increased panic attacks associated with multiple recent medication changes." (*Id.* at PageID.1613–14). Throughout this period, Plaintiff's attention was noted to be either distractable or variable with her functional status ranging from mildly to moderately impaired. (*Id.* at PageID.1600, 1603, 1607, 1610, 1613).

Other evidence is discussed as relevant below.

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a

medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

28

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  *Id.* § 404.1520c(a).  "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."  *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.* § 404.1520c(c).

29

The first factor is "supportability."  For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion.  In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant."  *Id*. § 404.1520c(c)(3).  This factor includes analysis of:

(i)    Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)   Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)  Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)   Extent of the treatment relationship.  The kinds and extent of

examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v) Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior

administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

32

will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous

level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)      Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)     Statements about whether or not [the claimant has] a severe impairment(s);

(iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)     Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)  Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a

nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.*  The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory

35

diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings,

and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the

claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)   Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.     Argument and Analysis

As stated above, Plaintiff raises one issue on appeal.  Whether the ALJ failed to evaluate the medical opinions of record in accordance with the relevant regulations.

#### 1.     Legal Standard

As a refresher, when evaluating medical opinions, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  An ALJ must explain her approach with respect to supportability and consistency.  *Id*. § 404.1520c(b).  Supportability means "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Further, the ALJ is required to provide a "sufficiently detailed articulation of application of those factors in which the ALJ must show their work, *i.e.*, to explain in detail how the factors actually were applied to each medical source." *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp. 1010, 1020 (E.D. Mich. 2022) (citation modified). "[T]he measuring stick for an 'adequate discussion' [of these factors] is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of h[er] finding as to whether the particular medical opinion was supported by substantial evidence." *Terhune v. Kijakazi*, No. 3:21-37, 2022 WL 2910002, at *3 (E.D. Ky. July 22, 2022) (citations omitted).

### 2. Medical Opinions

Plaintiff argues that the ALJ erred when evaluating several medical opinions, specifically those from Dr. MacAdams, Rosser, and the state agency psychological

consultants and consultative examiner.

The agency psychological consultant at the initial level concluded Plaintiff's alleged psychiatric impairments were not disabling. (ECF No. 6-1, PageID.96–97). She found Plaintiff had mild limitations in her abilities to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace, and no limitations in her ability to adapt or manage herself. (*Id.* at PageID.97).

Before Plaintiff's application was reconsidered, she underwent a psychiatric evaluation with a consultative examiner. (*Id.* at PageID.780–82). Plaintiff reported quitting her job of ten years as a medical transcriptionist in March 2022, due to "feeling overwhelmed" and like "she was not able to concentrate." (*Id.* at PageID.780). Around that time, her mother was released from prison, which "invoked a lot of childhood trauma memories." (*Id.*). Plaintiff's three inpatient psychiatric hospitalizations all occurred in the late 1990s. (*Id.*). Following unremarkable testing, the examiner provided the following medical source statement: "Understanding and memory: mild impairment. Concentration, persistence and pace: mild impairment. Social: mild impairment. Adaptation: no impairment." (*Id.* at PageID.781–82).

The consultant who reconsidered the denial also concluded Plaintiff's alleged psychiatric impairments were not disabling. (*Id.* at PageID.109–113). But he found that Plaintiff had mild limitations in her abilities to understand, remember, or apply

41

information; interact with others; and adapt or manage herself, as well as a moderate limitation in her ability to concentrate, persist, or maintain pace.  (*Id.* at PageID.110).

His rationale follows:

> Despite [symptoms] [Plaintiff] is able to manage aspects of a functional daily routine.  Her ongoing struggle with anxiety, and depression does appear to have some impact on her ability to manage daily chores and responsibilities on a consistent basis.  While it is reasonable to conclude that there is reduction in pace and persistence, [Plaintiff] remains capable of managing simple tasks mentally within a work environment with only routine predictable work stressors.   This assessment is modified.

(*Id.* at PageID.113).

Dr. MacAdams authored two opinions, the first on August 1, 2022, and the second on February 16, 2024.  (ECF No. 6-1, PageID.567–76; ECF No. 6-2, PageID.1622–25).  In the first opinion, Dr. MacAdams explained that Plaintiff was receiving trauma-focused psychotherapy and that she "has demonstrated continual progress toward treatment goals, though would likely make more progress if external stressors were reduced."  (ECF No. 6-1, PageID.567).  As to her ability to work, Dr. MacAdams opined that Plaintiff has endured lifelong trauma "that has resulted in PTSD including longstanding symptoms of anxiety, depression, panic and chronic health issues.  [Plaintiff] is unable to appropriately care for herself while sustaining a full time job." (*Id.*).  However, he also said that if Plaintiff continued to participate in treatment and limited her external stressors, she would likely "achieve symptom reduction and improved quality of life." (*Id.*).

42

In his first opinion, Dr. MacAdams estimated that Plaintiff would be off task for 15% of a typical workday, be anticipated to miss more than four days per month of work, and struggle with aspects of work including abrupt changes, consistently engaging with others, and stress. (*Id.* at PageID.568–70). More specifically, he said that Plaintiff "struggles to maintain healthy relationships and becomes easily fatigued and drained by interpersonal interactions. She has struggled with being in crowded places and often experiences panic attacks while driving." (*Id.* at PageID.570).

Dr. MacAdams' second opinion is consistent with his first. (ECF No. 6-2, PageID.1622–25). But in this opinion, he emphasized that Plaintiff's "[f]requent psychiatric medication changes have had significant adverse side effects including but not limited to: dizziness, insomnia, [indecipherable], fatigue, mental fog, lethargy, [and] variable mood." (*Id.* at PageID.1622). He opined that Plaintiff "has demonstrated moderate deficits in daily functioning" due to her PTSD. (*Id.*). He further opined that Plaintiff "is unable to appropriately care for herself and receive treatment while maintaining full time employment." (*Id.*). Dr. MacAdams again stressed Plaintiff's difficulties with social interaction and being in public generally. (*Id.* at PageID.1625).

Annissa Rosser, PMHNP, from New Oakland also provided a medical opinion in February 2024. (*Id.* at PageID.1497–1500). She indicated Plaintiff's diagnoses

43

were Bipolar I disorder, generalized anxiety disorder, and panic disorder, and that she was "making some progress toward stabilization." (*Id.* at 1497). Plaintiff's prescribed medications caused side effects of somnolence, drowsiness, restlessness, agitation, headaches, dizziness, and insomnia. (*Id.*). Rosser estimated that Plaintiff's symptoms would be severe enough to cause her to be off task at least 25% of the time and miss more than four days of work per month. (*Id.* at PageID.1498, 1500). However, she also indicated that Plaintiff's impairment had not lasted and was not expected to last for at least 12 months. (*Id.* at PageID.1500).

### 3.      Analysis

Contrary to Plaintiff's arguments on appeal, the ALJ's decision illustrates her close, careful review of the record, including the medical opinions now at issue. The ALJ thoroughly explained the weight afforded to each opinion, in accordance with the regulations and caselaw, meaning she applied the relevant factors, including explicit discussion of the supportability and consistency of the opinions, and the Court is able to understand her reasoning. *See Huizar*, 610 F. Supp. at 1020. The ALJ's analysis of the medical opinions follows:

> Turning to the opinion evidence that focuses solely on the claimant's mental functioning, the January 2023 and June 2023 prior administrative medical findings of Sheri L. Tomak, Psy.D., and Colin King, Ph.D., are not persuasive (Exhibits 1A/10-12; 4A/6). At the initial level, Dr. Tomak opined the claimant has no limitation in adapting or managing oneself and mild restrictions in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. Upon reconsideration,

44

Dr. King generally adopted the prior assessment except he found the claimant has mild restriction in adapting or managing oneself and moderate limitation in concentrating, persisting, or maintaining pace, which limits her to managing simple tasks mentally within a work environment with only routine predictable work stressors.   These assessments are not entirely consistent with or supported by the evidence of record.  While she was sometimes noted to be preoccupied, shaking, or distractible with variable attention and concentration, medical professionals generally determined her memory, thought process/content, speech, ability to follow simple commands, appearance, grooming, insight, judgment, and impulse control were within normal limits (e.g., Exhibits 17F/10; 23F/7, 20, 27, 40, 60, 67; 25F/37, 40, 43, 46, 49, 52, 55, 61, 70, 76, 82, 88, 94, 100, 107, 113, 118).   However, because clinicians have also described her as depressed, tearful, or anxious with labile mood and dysphoric/blunted/flat affect, the undersigned finds she also has moderate limitation in interacting with others and has the social interaction limitations outlined above (Exhibits 13F/25, 43; 23F/7, 20, 27, 40, 67; 17F/9-10; 25F/4, 7, 13, 19, 22, 37, 43, 46).

The December 2022 opinion of psychiatric consultative examiner Thomas E. Jordan Jr., M.D., is also unpersuasive (Exhibit 9F/3).  Dr. Jordan opined the claimant has no limitation in adaptation and mild restrictions in understanding and memory; concentration, persistence, and pace; and social interaction.  While this opinion is supported by his relatively normal mental status examination findings, he only examined the claimant once (Exhibit 9F/2).  It is also consistent with evidence from other sources.  Because they sometimes described the claimant as depressed, tearful, anxious, preoccupied, shaking, and distractible with labile mood, dysphoric/blunted/flat affect, and variable attention and concentration, the undersigned concludes the claimant has moderate limitations in interacting with others and concentrating, persisting, or maintaining pace and requires the mental limitations noted above (e.g., Exhibits 13F/25, 43; 17F/10; 23F/7, 20, 27, 40, 60, 67; 25F/37, 40, 43, 46, 49, 52, 55, 61, 70, 76, 82, 88, 94, 100, 107, 113, 118).

Likewise, the February 2024 opinion of Annissa Rosser, PMHNP, is not persuasive (Exhibit 24F).  She insisted the claimant would be off task twenty-five percent or more of the workday and absent four or more days a month.  She also suggested the claimant has limitations

45

ranging from serious to no useful ability to function in most areas of mental functioning.  For instance, she claimed the claimant is unable to meet competitive standards in areas like maintaining attention for two-hour segments, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, making simple work-related decisions, and completing a normal workday or workweek without an unreasonable number and length of rest periods.  She also felt the claimant has serious limitations in areas like understanding and remembering very short and simple instructions, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, interacting with the general public, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness.  Such restrictive limitations are not supported by her own notes or consistent with evidence from other sources.  While they sometimes observed the claimant sometimes presented as depressed or anxious with labile affect and impaired concentration/attention, they often determined the claimant's attitude/behavior, thought process/content, speech, grooming/hygiene, orientation, impulse control, and judgment were all within normal limits (e.g., Exhibits 17F/10; 23F/40-41, 59-61, 67-68; 25F/37, 40, 118).

The August 2022 and February 2024 statements from Evan MacAdams, Psy.D., are also not persuasive (Exhibits 6F; 26F).  In addition to suggesting the claimant is likely to be off task fifteen to twenty-five percent of the workday and absent more than four days per month, he felt the claimant has no useful ability to function in areas like . . . performing at a consistent pace without an unreasonable number and length of rest periods and dealing with normal work stress; and interacting with the general public.  He also claimed the claimant is unable to meet competitive standards in areas like maintaining regular attendance and being punctual within customary tolerances, working in coordination with or proximity to others without being unduly distracted, and interacting appropriately with the general public.  These opinions are not supported by his own treatment notes or consistent with evidence from other clinicians.  Although they suggested the claimant sometimes presented as depressed, anxious, and preoccupied with dysphoric mood and variable concentration, mental status examinations were otherwise within normal limits (e.g., Exhibits

13F/22, 25, 34, 37, 40, 49, 52, 55, 58, 61, 64, 67, 70, 73, 76, 79, 82, 85, 88, 91, 94, 97, 100; 17F/10; 23F/40-41, 59-61, 67-68; 25F/46, 49, 52, 55, 61, 70, 76, 82, 88, 94, 100, 107, 113, 118).

Dr. MacAdams also completed a form in September 2022 after the claimant started seeing him again in October 2021 (Exhibit 7F). Among other things, he mentioned that the claimant was struggling with impaired concentration/attention and emotional dysregulation, becomes markedly distressed after social interactions, would have difficulty attending to a regular work schedule, and needs remote work that is flexible in nature, among other things. To the extent that the comments on this form constitute a medical opinion, they are not persuasive because they are not consistent with evidence from other sources or supported by their own notes. Medical professionals sometimes felt she presented as depressed, anxious, and preoccupied with dysphoric mood and variable concentration, but determined mental status examinations were otherwise within normal limits (e.g., Exhibits 13F/22, 25, 34, 37, 40, 49, 52, 55, 58, 61, 64, 67, 70, 73, 76, 79, 82, 85, 88, 91, 94, 97, 100; 17F/10; 23F/40-41, 59-61, 67-68; 25F/46, 49, 52, 55, 61, 70, 76, 82, 88, 94, 100, 107, 113, 118).

(ECF No. 6-1, PageID.49–51).

After reviewing the opinions at issue and the ALJ's evaluation of the same, "[t]he Court finds that the ALJ sufficiently articulated the supportability and consistency" of each opinion. *Mark D. v. Comm'r of Soc. Sec.*, No. 6:24-CV-166, 2025 WL 1656639, at *7 (E.D. Ky. June 11, 2025). The ALJ "properly considered the factors as set forth in the regulations to determine the persuasiveness" of each opinion, including "articulating the supportability and consistency of each medical opinion." *Id.* (citation modified). While an ALJ is not required to use the words supportability and consistency in her analysis, *see id.* (collecting cases), the ALJ

here *did* use these terms when explaining how persuasive she found each opinion.

Contrary to what Plaintiff now argues, the ALJ did not selectively review the records to support a conclusion that Plaintiff was not disabled.  Rather, it is apparent from the ALJ's decision that she considered both favorable and unfavorable records because she explicitly discussed and cited to them.  For example, to discount the opinions of the agency consultants, the ALJ cited records where Plaintiff's providers "described her as depressed, tearful, or anxious with labile mood and dysphoric/blunted/flat affect" and went on to find that Plaintiff had a greater limitation in interacting with others than opined by either agency consultant.  (ECF No. 6-1, PageID.49).  As for the consultative examiner's opinion, the ALJ noted that even though the opinion was supported by the "relatively normal mental status examination findings, he only examined the claimant once" and it was not fully consistent with records from Plaintiff's treating providers where she was sometimes noted to appear "depressed, tearful, anxious, preoccupied, shaking, and distractible with labile mood, dysphoric/blunted/flat affect, and variable attention and concentration."  (*Id.* at PageID.49–50).  Because of this inconsistency, the ALJ found that Plaintiff had "moderate limitations in interacting with others and concentrating, persisting, or maintaining pace and requires the mental limitations" contained in the RFC.  (*Id.* at PageID.50).

When evaluating the opinions from Plaintiff's treating providers (*i.e.*, Dr.

MacAdams and Rosser), the ALJ continued to rely on evidence that cut both directions on the issue of whether Plaintiff is disabled.  The ALJ explained that Dr. MacAdams' opinions "are not supported by his own treatment notes or consistent with evidence from other clinicians.  Although they suggested [Plaintiff] sometimes presented as depressed, anxious, and preoccupied with dysphoric mood and variable concentration, mental status examinations were otherwise within normal limits." (*Id.* at PageID.50).  The records support the ALJ's conclusion.  Plaintiff treated with Dr. MacAdams from September 1, 2022 through February 14, 2024.  While Dr. MacAdams frequently indicated Plaintiff's mood was dysphoric or anxious with a consistent or congruent affect, he also noted her functional status was intact for every appointment until May 17, 2023 (ECF No. 6-2 PageID.1525), where he rated it as mildly impaired for the first time, and he rated her concentration as good at every appointment until June 7, 2023 (*id.* at PageID.1534), where it was distractable.  Dr. MacAdams' lowest ratings for Plaintiff's functional status was moderately impaired and for concentration was distractable.

Similarly, the ALJ discounted Rosser's opinion, explaining:

Such restrictive limitations are not supported by her own notes or consistent with evidence from other sources.  While they sometimes observed [Plaintiff] sometimes presented as depressed or anxious with labile affect and impaired concentration/attention, they often determined [Plaintiff's] attitude/behavior, thought process/content, speech, grooming/hygiene, orientation, impulse control, and judgment were all within normal limits.

(ECF No. 6-1, PageID.50). Here again, the ALJ recognized that Rosser's opinion was somewhat, but not fully, consistent with treatment records. While Plaintiff presented to several New Oakland appointments between March 9, 2023 and February 1, 2024, in an impaired mood with impaired concentration, she was also routinely described as cooperative, pleasant, and engaged with appropriate grooming and hygiene. It is thus understandable why the ALJ discounted Rosser's opinion where she indicated Plaintiff had serious limitations in areas including "maintaining socially appropriate behavior" and "adhering to basic standards of neatness and cleanliness." (*Id.*).

To the extent Plaintiff argues the ALJ should have been even more thorough in her discussion of the records when evaluating the medical opinions, the Court disagrees. While a plaintiff "may believe that the ALJ should have specifically discussed all of the medical evidence when evaluating the supportability and consistency" of each opinion, this is not required. *Mark D.*, 2025 WL 1656639, at *8. The ALJ's discussion "does not need to be lengthy" and "there is no requirement that an ALJ discuss each limitation from an opinion that she adopts, or fails to adopt, when she has rejected or adopted the opinion on broader grounds." *Id.* (citation modified). The ALJ's decision here far exceeds these basic requirements and is not analogous to the ones at issue in cases cited by Plaintiff such as *Marci M. v. Comm'r of Soc. Sec.*, No. 2:22-CV-12204, 2024 WL 1478185 (E.D. Mich. Jan. 29, 2024),

50

*report and recommendation adopted*, 2024 WL 1138032 (E.D. Mich. Mar. 15, 2024) (remanding where the ALJ's evaluation of a medical opinion was "riddled with errors" like not addressing the supportability factor) and *Mary S. v. Comm'r of Soc. Sec.*, No. 2:25-CV-10905, 2026 WL 674256 (E.D. Mich. Mar. 10, 2026) (remanding where "[t]he ALJ did not properly explain the supportability and consistency factors").

Moreover, to the extent Plaintiff argues that the ALJ erred by not including the exact same limitations in the RFC as those suggested by any medical source, this is not error. Even where an ALJ finds an opinion persuasive, there is no requirement to adopt all limitations, *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015), nor is there a "requirement to cite to every piece of evidence or conclusion," *Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. Nov. 22, 2022). Plaintiff specifically argues that it is unclear how the ALJ reached her ultimate disability determination because she rejected all medical opinions of record. However, reading the decision as a whole, it is clear that the ALJ discounted the treating opinions for being overly restrictive and the agency opinions for the opposite reason. The RFC reflects that the ALJ found Plaintiff's limitations to fall between these two extremes. And as the Commissioner points out, the ALJ assessed a *more limited* RFC than the consultants and the examiner, which further undermines Plaintiff's argument. *See Mosed v. Comm'r of Soc. Sec.*, No.

51

2:14-cv-14357, 2016 WL 6211288, at *7 (E.D. Mich. Jan. 22, 2016) ("Plaintiff's argument that the ALJ erred in assessing a *more restrictive* RFC than that opined by the State agency consultants is curious and unavailing." (emphasis in original)), *report and recommendation adopted*, 2016 WL 1084679 (E.D. Mich. Mar. 21, 2016).

Ultimately, the Court concludes that the ALJ's conclusions as to the persuasiveness of each opinion are supported by substantial evidence. And because the ALJ adequately complied with the relevant regulations and supported her assessments of the opinions with substantial evidence, "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citation modified). Accordingly, Plaintiff's motion for summary judgment is denied.

## III.  ORDER

For these reasons, Plaintiff's motion for summary judgment is **DENIED** (ECF No. 10), Defendant's motion for summary judgment is **GRANTED** (ECF No. 12), and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: May 11, 2026                          S/PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge